UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARC E. SCHALK,

               Plaintiff,                       Civil Action No. 10-cv-13894

      v.                                 District Judge Nancy G. Edmunds
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 10]**

       Plaintiff Marc E. Schalk ("Plaintiff" or "Claimant") brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions, (Dkts. 9, 10) which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), (Dkts. 3, 12).

**I. RECOMMENDATION**

       For the reasons set forth below, this Court finds that the ALJ failed to fully comply with the procedural requirements of the treating source rule. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED for the ALJ to comply with the procedural requirements of the treating source rule.

## II. REPORT

### A. Procedural History

Plaintiff alleges that he became unable to work on January 9, 2007. (Tr. 15.) The Commissioner denied Plaintiff's disability application on August 1, 2007. (Tr. 76-79.) Plaintiff then filed a request for a hearing, and on August 12, 2009, he appeared with counsel before Administrative Law Judge ("ALJ") Peter N. Dowd, who considered the case *de novo*. (Tr. 28-71.) In a December 8, 2009, decision, the ALJ found that Plaintiff was not disabled. (Tr. 10-21.) The ALJ's decision became the final decision of the Commissioner on September 2, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1-3.) Plaintiff filed this suit on September 30, 2010.

### B. Background

Plaintiff was 36 years old at the time of the administrative hearing and ALJ's decision in this matter. (Tr. 35.) He has a twelfth-grade education. (*Id.*) From 1994 through 2007, he worked as a cook, an auto parts inspector, a retail groundskeeper, a hospital housekeeper, a security guard, and a bus driver. (Tr. 15.) Plaintiff "stopped working in 2006 as a bus driver [because] he missed too many days from work due to symptoms of anxiety, depression and stomach pain." (Tr. 15.)

#### 1. Plaintiff's Testimony

At the August 12, 2009 hearing before the ALJ Plaintiff testified regarding his anxiety and depression. (Tr. 28-71.) In conjunction with these conditions, Plaintiff suffers from abdominal pain, nausea, and diarrhea. (Tr. 43.) Plaintiff feels like he is "going to throw up all the time," and has trouble sleeping. (*Id.*) Currently, he sees both a psychiatrist, Dr. Anne Tadeo, and a psychologist, Deanna Hodgson, for his anxiety and depression. (Tr. 46.) He takes Cymbalta and Xanax for these

2

mental conditions.  (Tr. 48.)

Plaintiff testified that he is able to care for himself, but sometimes doesn't even "feel like getting out of bed to bathe or do anything."  (Tr. 51.)  He also does some meal preparation, household chores, cleaning, and laundry.  (*Id*.)  Plaintiff has his own e-mail address and uses the computer regularly.  (*Id*.)  He occasionally does the grocery shopping as well.  (Tr. 52.) He has problems with anxiety with driving, and does not own a car.  (Tr. 53.)  He testified that he relates well to other people, but would have problems working on a job with other people due to his "social anxiety."  (Tr. 56.)  However, he admitted to being able to concentrate long enough to "carry on a telephone conversation," use the computer, and read a newspaper.  (Tr. 57.)  He can get "violently sick" just "at the thought of working" or "going out of the house."  (Tr. 59.)

### 2.  Medical Evidence

Plaintiff has suffered from anxiety attacks since 1999.  (Tr. 222.)  He started seeing Dr. Munawar Ahmad at Community Mental Health for Central Michigan ("CMH") in May of 2003 regarding these attacks.  (Tr. 222-24.)  Indeed, most of Plaintiff's medical evidence comes from Dr. Ahmad and Therapists Kelly J. Kubiak and Melissa Maxwell at CMH, and Dr. Anne Tadeo and Psychologist Deanna Hodgson at M.P.A. Group NFP, Ltd. (Tr. 222-388.)

### (a) Dr. Ahmad and Therapists Kubiak and Maxwell

Dr. Ahmad, a psychiatrist, performed medication reviews for Plaintiff every two to three months from October 14, 2005 through July 27, 2007.  (Tr. 237-321.)

On January 1, 2007, Therapist Kelly J. Kubiak completed an initial intake report for Plaintiff's treatment at CMH.  (Tr. 283.)  She listed his panic symptoms as: sweating, trembling, chest pain, nausea, dizziness, derealization, fear of dying, numbness, and chills or hot flashes.  (*Id*.)

3

She listed his depression symptoms as: anhedonia[1], fatigue, diminished self-esteem and insomnia. (*Id*.)  In describing Plaintiff's current "psycho/social situation," Kubiak noted: "His fiancé died two years ago of a drug overdose.  It was ruled a suicide but Marc is not sure if she actually meant to do it."  (Tr. 287.)  She also noted other traumas in his life: his divorce and the loss of his grandmother. (*Id*.)

Plaintiff saw Kubiak for therapy on a monthly basis through August 2, 2007.  (Tr. 294, 296, 297, 299.)

On July 19, 2007, Kubiak noted:

> Marc states that he had bad nightmare last week about his fiancé who died of an overdose.  Marc states he couldn't shake the depression and anxiety that followed the nightmare for several days after and is still trying to let it go, but is doing better. . . . Though Marc is able to rationally know that he is not responsible for her death it is hard for him to not feel he could have done more to prevent it.  He isn't sure this will ever leave him completely.  Marc continues to work when he can.  He states that last week when he was down he was unable to work much.  Discussed coping and managing symptoms during these times.

(Tr. 297)

On September 26, 2007, Kubiak completed a Multiaxial Assessment of Plaintiff.  (Tr. 290.) As this time, she gave him a Global Assessment Functioning ("GAF") score of 50[2].  (Tr. 291.)

---

[1]Anhedonia is the "total loss of feeling of pleasure in acts that normally give pleasure." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 92 (Saunders Elsevier eds. 31st 3d. 2007).

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th ed. 1994).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id*. at 32.  A GAF of 41 to 50 means that the patient has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id*.

4

Plaintiff transferred to Therapist Melissa Maxwell after Kubiak resigned from CMH. (Tr. 299, 302.)

Plaintiff saw Maxwell on a monthly basis from October 3, 2007 through June 17, 2008. (Tr. 307, 309, 316, 318, 320, 321, 330, 333, 335, 337.)

On October 11, 2007, Maxwell noted:

> He reports he is under a lot of stress due to bills and other financial stressors. This is also the month that Melissa passed away and he reports that this month is always very hard for him. Mark [sic] said he tried the relaxation technique that I sent home with him last week and he reports it did calm him down. . . . Mark [sic] and I discussed possibly going to a grief group but he does not think he can handle it due to his anxiety and panic episodes.

(Tr. 309.)

On that same day, Maxwell completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) for Plaintiff. (Tr. 311.) She assessed him as moderately limited in the following: (1) ability to remember locations and work-like procedures; (2) ability to understand and remember detailed instructions; (3) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) ability to sustain an ordinary routine without special instruction; and (5) ability to travel in unfamiliar places or use public transportation. (Tr. 311-13.) She assessed him as markedly limited in his ability to "complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 312.)

On November 21, 2007, Plaintiff reported "feeling good the past couple of days." (Tr. 317.) However, on December 5, 2007, he was struggling with "memories of Melissa" again. (Tr. 318.) Likewise, on January 2, 2008, he reported "that he had some issues a few days ago when he smelled some lotion that reminded him of his ex Melissa." (Tr. 320.)

5

On February 6, 2008, Maxwell assigned Plaintiff a GAF of 50.  (Tr. 321.)

*(b) Dr. Tadeo and Psychologist Deanna Hodgson*

Plaintiff moved from Bay City to Midland sometime in 2008.  (Tr. 349.)  In Midland, he resumed therapy with Psychologist Deanna Hodgson of M.P.A. Group NFP, Ltd. (*Id*.)  On October, 29, 2008, in her initial assessment, Hodgson noted:

> Marc was engaged to be married a second time and she died from a "drug overdose."  He reports this happened 5 years ago and he continues to struggle with her death and not seeing her children.  She had three children ages 6, 10 and 12.  Their biological father "committed suicide."  He was with her for "4 years. . . ."  He does not talk about her to his current girlfriend or family because "they all think I should be over it."  He does admit to having "flash backs" as he was the one who found her and his niece performed CPR in front of him.  He is dealing with guilt issues as well.

(Tr. 349, 353.)  She also noted that Plaintiff was "able to perform all household tasks" in the "Activities of Daily Living" section.  (Tr. 351.)  She gave him a GAF score of 60 at that time.[3]  (Tr. 353.)  Plaintiff continued to see Hodgson twice a month through March 31, 2009.  (Tr. 356, 362-67, 369, 370-72, 375.)  During this time he also saw Dr. Anne Tadeo for medication reviews.  (Tr. 368, 374.)

On December 15, 2008, Hodgson noted that Plaintiff was "attending church" and enjoying it.  (Tr. 364.)  He also joined a "church basketball team."  (*Id*.)

On December 29, 2008, Hodgson noted that Plaintiff "visited his family over the holidays and reports that things went well.  Marc continues to play basketball on his church team and this was encouraged.  Discussed the benefits of exercising to increase mood and decrease anxiety." (Tr. 365.)

---

[3] A GAF of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.  AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 30 (4th ed. 1994).

However, he continued to struggle with the death of his former fiancé, stating that he felt "he could have done something to prevent her death." (Tr. 369.)

Indeed, throughout his therapy with Psychologist Hodgson, Plaintiff focused on his former fiancé's death. On January 12, 2009, Hodgson noted that Plaintiff continued to "struggle with his fiancé's death." (Tr. 366.) Likewise, on January 26, 2009, Hodgson noted that Plaintiff felt guilt and anger over his fiancé's death. (Tr. 367.) On February 6, 2009, Hodgson noted that Plaintiff felt "that he could have done something to prevent her death." (Tr. 369.) On March 11, 2009, Plaintiff told Hodgson that "a few days ago he started crying 'for no reason.'" (Tr. 371.) He also indicated that weather affected his mood. (*Id.*) On March 31, 2009, Plaintiff told Hodgson that he felt as if he was abandoned by his former fiancé. (Tr. 375.) He also told her that he felt "incredible guilt over her death." (Tr. 375.) The next medical record from Hodgson is a June 8, 2009 Periodic Review. (Tr. 376.) Hodgson indicated there was "no change in assessment data or diagnosis." (*Id.*)

On June 29, 2009, Hodgson completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (Tr. 377-79.) Hodgson assessed Plaintiff as moderately limited in the following areas: (1) ability to remember locations and work-like procedures; (2) ability to understand and remember very short and simple instructions; (3) ability to carry out very short and simple instructions; (4) ability to sustain an ordinary routine without special supervision; (5) ability to make simple work-related decisions; (5) ability to get along with co-workers or peers without distracting them or exhibiting behavior extremes; (6) ability to respond appropriately to changes in the work setting; (7) ability to travel in unfamiliar places or to use public transportation; and (8) ability to set realistic goals or make plans independently of others. (Tr. 377-79.)

She also assessed him as markedly limited in the following areas: (1) ability to understand

7

and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) ability to work in coordination with or proximity to others without being distracted by them; (6) ability to complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) ability to interact appropriately with the general public; (8) ability to ask simple questions or request assistance; and (9) ability to accept instructions and respond appropriately to criticism from supervisors.  (*Id*.)

*(c) State Disability Evaluations*

On July 27, 2007, prior to his treatment with Therapist Hodgson, Plaintiff was evaluated by Mark Garner, Ph.D., on behalf of the state DDS.  Dr. Garner completed a Psychiatric Review Technique Form ("PRTF") and verified that Plaintiff suffered from anxiety and depression.  (Tr. 258-61.)  He noted that Plaintiff suffered from "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week."  (*Id.* at 263.)  As to the category "B" criteria of Impairments 12.04 and 12.06, Garner found Plaintiff moderately limited in maintaining social functioning and maintaining concentration, persistence or pace.  (Tr. 268.)  He indicated that Plaintiff did not satisfy the category "C" criteria.  (Tr. 269.)

Garner  also completed a Mental Residual Functional Capacity Assessment for Plaintiff .  (Tr. 254-56.)  Garner found Plaintiff moderately limited in his ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods; and his ability

8

to work in coordination or proximity to others without being distracted.  (Tr. 254.)  He also found Plaintiff moderately limited in his ability to understand and remember detailed instructions; his ability to interact appropriately with the general public; and his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 254-56.)  However, Garner concluded that Plaintiff "retains the ability to do one and two step tasks on a sustained basis."  (Tr. 256.)

On September 29, 2009, Mark Zaroff, Ph.D., assessed Plaintiff pursuant to an order from the ALJ.  (Tr. 381-87.)  In his assessment, he noted that Plaintiff "did not seem to be exaggerating or minimiz[ing] any symptoms today." (Tr. 383.)  He also noted that Plaintiff's primary problems were depression and anxiety and that "his effect is dysthymic[4]." (Tr. 383.)  Zaroff gave him a GAF of 55. (Tr. 385.)  His prognosis was "guarded," but he stated: "This individual should be able to engage in a number of work related activities at this time, which in itself, often helps to alleviate some of the depression and anxiety as it is a form of exposure therapy in a sense."  (Tr. 385.)

Zaroff completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form.  (Tr. 386-88.)  He assessed Plaintiff as moderately limited in the following areas: (1) ability to understand and remember complex instructions; (2) ability to carry out complex instructions; and (3) the ability to make judgments on complex work-related decisions.  (Tr. 386.) He noted that, "Marc's anxiety will worsen under stress until he learns to manage it better."  (*Id.*) He also assessed Plaintiff as mildly socially impaired.  (Tr. 387.)

### 3. *Vocational Expert's Testimony*

Vocational Expert ("VE") Michelle Robb testified at the hearing.  (Tr. 63-71.)  The ALJ

---

[4] Dysthemic means "characterized by symptoms of mild depression." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 590 (Saunders Elsevier eds. 31st 3d. 2007).

9

asked the VE to assume the following hypothetical individual:

> I'm going to ask you to assume an individual of Mr. Schalk's age, education and past work experience, and that the individual from a physical standpoint is not exertionally – or non-exertionally limited, and that from a mental standpoint the individual can do simple, routine, and repetitive work activities in a stable work environment and can tolerate superficial contacts with supervisors and coworkers in a potential work setting, but could not or should not work with the general public.

(Tr. 67.)  The VE testified that such a person could perform Plaintiff's past work as an inspector, groundskeeper and cook.  (*Id*.)  These jobs "exist in the thousands" in the "lower peninsula of the State of Michigan."  (Tr. 68.)

On cross, the VE testified that if the above-described hypothetical person had to miss one day of work a week "due to an inability to leave home," it would preclude the individual from working in the above-described jobs.  (Tr. 68.) On cross, the VE also testified that if the hypothetical individual had panic attacks one to three times a week, "[i]t would likely result in termination over time."  (*Id*.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 9, 2007 — Plaintiff's alleged onset date.  (Tr. 15.)  At step two, the ALJ found that Plaintiff had the following severe impairments: (1) anxiety and panic disorder; and (2) depression.  (Tr. 16.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 18.)  Between steps three and four, the ALJ determined that

11

Plaintiff had the residual functional capacity to perform "simple, routine and repetitive work activities in a stable work environment" at all exertional levels with "superficial contacts with supervisors and coworkers," but no "contact with the general public." (Tr. 19.) At step four, the ALJ found that Plaintiff could perform his past relevant work as an auto parts inspector and retail mall groundskeeper. (Tr. 20.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

**F. Analysis**

*1. The ALJ Failed to Comply with the Procedural Requirements of the Treating Source Rule*

Plaintiff argues that the ALJ committed reversible legal error by failing to give the proper weight to Plaintiff's treating mental health professionals. (Dkt. 9, Pl.'s Mot. Summ. J. at iii.) Specifically, Plaintiff argues that the ALJ did not give proper weight to Psychologist Hodgson. (*Id.* at 4-7.) The Commissioner responds that the "ALJ reasonably gave less weight to the severely restricted opinion" of Therapist Hodgson. (Dkt. 10, Def.'s Mot. Summ. J. at 1.) The Commissioner

13

argued that the ALJ's determination that Hodgson's "assessment [did] not make sense" satisfied the treating physician rule.  (*Id.* at 16.)

Under the "treating source rule," an ALJ must generally give greater deference to the opinions of treating physicians and psychologists than to those of non-treating physicians and psychologists.  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; SSR 96-2p.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).  And even where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source."  *Id.*; 20 C.F.R. § 404.1527.

This Regulation, 20 C.F.R. § 404.1527(d)(2), "contains a clear procedural requirement."  *Wilson*, 378 F.3d at 544.  In particular, "the [ALJ's] decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188 at *5; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  Moreover, "a failure to follow the procedural requirement of identifying the reasons for

14

discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The Sixth Circuit has suggested, however, that a violation of the procedural requirement might be "harmless error" in the following circumstances: (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. "In the last of these circumstances, the procedural protections at the heart of the rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend*, 375 F. App'x at 551 (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006)).

The ALJ here did not give any weight Hodgson's opinion. (Tr. 17.) Despite crediting her intake GAF score of 60, he did not give weight to her medical assessment of Plaintiff's ability to do work related activities. (*Id.*) The reason he gave for discrediting this assessment is that it "did not make sense in terms of the rated GAF of 60":

> Diana Hodgson MA, LLPC-CAAC, an outpatient therapist at the MPA Group, completed a medical assessment of the claimant's ability to do work-related activities on June 29, 2009. This therapist opined the claimant has moderate to markedly limited difficulties in understanding and memory, moderate to markedly limited difficulties in sustaining concentration and persistence, moderate to markedly limited difficulties in social interaction and moderately limited difficulties in adaptation. However, this assessment does not make

15

sense in terms of the rated GAF of 60.
(*Id.*)

He also stated that the "office records of MPA do not support the most recent assessment by Ms. Hodgson." (Tr. 18.) Lastly, he noted that "Dr. Zaroff's evaluation of the claimant does not support Ms. Hodgson's assessment." (*Id.*)

These explanations are not sufficient under 20 C.F.R. § 404.1527. Specifically, the ALJ did not note Plaintiff's length of treatment with Hodgson – eight months; he did not mention the nature and extent of the treatment – twice a month for eight months – as opposed to Dr. Zaroff who saw the Plaintiff one time; he did not note the evidence presented to support her opinion – her clinical notes and diagnostic forms; and he did not mention that Hodgson's opinion was consistent with Plaintiff's earlier therapist, Maxwell, in certain relevant areas.[5] Most significantly, he did not explain why he chose to credit her GAF score of 60, and not her opinions. Thus, the ALJ did not satisfy the explanatory requirement of the treating source rule in rejecting Hodgson's opinion as to Plaintiff's mental conditions. *Cole v. Astrue*, No. 09-4309, 2011 U.S. App. LEXIS 14491 at *13 (6th Cir. July 15, 2011) (stating that the ALJ's failure to explain why he credited the treating source's diagnosis but not his medical opinions was error); *Karger v. Comm'r Soc. Sec.*, 414 F. App'x. 739, 752 (6th Cir. 2011) (stating that the ALJ's failure to explain how he resolved conflict in the record evidence was error.) Accordingly, the next issue for this Court to address is whether the ALJ satisfied the *Wilson* exceptions to the treating physician procedural rule and, thus, his error was

---

[5] Such areas included finding Plaintiff to have moderate restrictions in: his ability to remember locations and work like procedures; his ability to sustain an ordinary routine without special supervision; and to perform at a consistent pace without an unreasonable number and length of rest periods; and his ability to travel in unfamiliar places or use public transportation. (Tr. 311-13, 377-79.) Also, both found Plaintiff to have marked restrictions in: his ability to complete a normal workday and work week without interruption from psychologically based symptoms. (Tr. 311-13, 377-79.)

16

harmless.

As an initial matter, it is clear that the ALJ did not satisfy the first two *Wilson* exceptions. In determining whether the ALJ satisfied the third exception by indirectly attacking Hodgson's opinion, the Court must consider the Sixth Circuit's opinion in *Nelson*, 195 F. App'x 462, 470-71 (6th Cir. 2006). Similar to Plaintiff, the claimant in *Nelson* filed for disability based on "anxiety, lack of concentration, panic attacks, feelings of hopelessness, and nervousness around others." *Id.* at 463. Two psychiatrists treated the claimant for separate ten month periods. *Id.* at 463-64, 466. The first opined that the claimant had "poor or no ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, or deal with work stresses." *Id.* at 464. The second remarked that the claimant "was markedly impaired in carrying out short, simple instructions and responding to changes in a routine work setting; and that he was extremely impaired in understanding, remembering, and carrying out detailed instructions, in interacting appropriately with the public and with supervisors, and in responding to pressures in a usual work setting." *Id.* at 466. The VE testified that if the claimant was limited in the manner these two physicians opined, the claimant would be precluded from work. *Id.* at 471. The ALJ, however, failed to discuss "specifically what weight" he gave to the two opinions, and concluded that the claimant could return to his past relevant work. *Id.* at 467.

The Court of Appeals found that while the ALJ's narrative did not satisfy the reasons-giving requirement of the treating physician rule, including the failure to discuss the treating-source opinion weighting factors, the non-conformity was harmless because the ALJ discussed other medical evidence that undermined the supportability of the two undiscussed opinions. *Id.* at 471. In particular, the Court noted that the two opinions were in "obvious conflict" with the medical

17

opinions of five other physicians who found that the claimant had only moderate limitations, with intact memory, concentration, and attention, and could work "alone or in a very reinforcing setting." *Id.* Because the ALJ specifically discussed four of these contrary opinions in the narrative, the Court concluded that the ALJ implicitly satisfied the reasons-giving requirement: "[w]e think it clear that the ALJ's discussion of the record evidence shows that the ALJ found the [two treating-source] opinions . . . to be inconsistent with the other record evidence." *Id.* at 471. The Court cautioned, however, that the case before it was "a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter." *Id.* at 472.

The Court finds that this is not the "rare case" where the ALJ implicitly satisfied the requirement to give good reasons for rejecting the treating source's opinion regarding the severity of Plaintiff's mental impairments. Unlike in *Nelson*, in which the ALJ discussed the findings of several medical providers who had come to different conclusions than the Plaintiff's treating physicians, the ALJ in this case only cited one contrary opinion to Hodgson's – that of Dr. Zaroff, the state disability examiner that saw the Plaintiff once after the ALJ ordered the visit. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (stating that the case was unlike *Nelson* because the ALJ only discussed the contrary opinion of a reviewing physician). The Sixth Circuit has held that the opinions of a treating source are generally entitled to greater weight than the contrary opinions of a consulting physician who has examined the Plaintiff on only one occasion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) Therefore, this Court finds that the ALJ did not satisfy the treating source rule.

### 2. The ALJ Failed to Account for the Opinions of Plaintiff's Treating Mental Health Professionals in His Residual Functional Capacity Assessment

Plaintiff argues that substantial evidence does not support the ALJ's residual functional

18

capacity assessment.  (Dkt. 9, Pl.'s Mot. Summ. J. at iii, 3.)  The Commissioner responds that the "ALJ reasonably accounted for Plaintiff's mental limitations in his RFC finding."  (Dkt. 10, Def.'s Mot. Summ. J. at 1.)

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  In this case the ALJ's hypothetical included the mental limitation of "simple, routine, and repetitive work activities in a stable work environment" along with the social limitation of only "superficial contacts with supervisors and coworkers" and no "work  with the general public."  (Tr. 67.)  The issue is whether this limitation accurately accounted for Plaintiff's  limitations in concentration persistence and pace and social interactions.

### a. Concentration, Persistence and Pace

The issue of whether hypothetical limitations such as "simple," "routine" and "unskilled" adequately account for moderate concentrational deficiencies — is not uncommon and the case law resolves it both ways.  Indeed, there is relevant authority ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks.[6]  However,

---

[6]*See e.g.*, *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007) ("Here, the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain concentration, persistence, and pace, she is able to perform simple, routine, repetitive work. However, the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations."); *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("In the present case, while finding that Plaintiff is 'moderately limited with concentration, persistence, and pace,' [the ALJ's] only limitations were with co-workers and the public, and to "unskilled, light jobs."  These parameters are not sufficient, and do not fully convey Plaintiff's limitations in concentration to the VE. Plaintiff may be unable

there is also authority that has found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.[7] (*See* Dkt. 12, Def.'s Mot. at 11.)

In analyzing this case law, the Court agrees that a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace because the difficulty of a task does not always equate with the difficulty of staying on task. *See e.g.*, *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%-30% of the time at work. Thus, 'moderate' concentration problems . . . need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of

---

to meet quotas, stay alert, or work at a consistent pace, even at an unskilled job." (internal citations omitted)); *Long v. Comm'r of Soc. Sec.*, No. 09-14227, 2010 WL 6413317, at *7 (E.D. Mich. Dec. 6, 2010) ("In the present case, the ALJ gave Plaintiff the mental limitation for 'simple unskilled work.' However, the ALJ also determined that 'with regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties.' The ALJ did not incorporate [that] limitation . . . into the controlling hypothetical. This was error." (internal citations omitted)); *Perkins v. Comm'r of Soc. Sec.*, No. 10-10089, 2010 WL 5634379, at *9 (E.D. Mich. Dec. 14, 2010) (same).

[7]*See e.g.*, *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of 'moderate' limitations . . . are not incompatible."); *Latare v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836, at *3 (E.D. Mich. April 20, 2009) ("The Law Judge's hypothetical questions to the Vocational Expert accurately described Plaintiff's moderate limitations caused by her depressive disorder. There is no merit to Plaintiff's argument that the ALJ should have included a limitation that she had moderate limitations in maintaining concentration, persistence or pace. Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

that sequence.  Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient."); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job.").

However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of "unskilled work" but excludes a moderate limitation in concentration.  Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC.  *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks.  Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace.").

In this case, the ALJ's limitation of simple, routine, and repetitive work activities in a stable work environment accurately reflects Zaroff's opinion as to Plaintiff's moderate limitations, which is the opinion, as discussed above, that the ALJ gave most weight.  Zaroff found that Plaintiff had the ability to understand, remember and carry out simple instructions, and the ability to make judgment on simple work-related decisions.  (Tr. 386.)  The hypothetical, however, does not accurately reflect Plaintiff's marked limitations as found by Therapist Hodgson.  Thus, to the extent the ALJ failed to comply with the treating source rule, as indicated above, this issue must be reevaluated upon the ALJ's compliance with the procedural requirements of that rule.  The current hypothetical may be adequate if the ALJ still finds that Dr. Zaroff's opinion deserves more weight

21

than that of Therapist  However, if after satisfying the procedural requirements of the treating source rule, the ALJ finds that Hodgson's opinion deserves more weight than that of Dr. Zaroff, the hypothetical is inadequate.

### b. Social Interactions

To the extent that Plaintiff argues that substantial evidence does not support the ALJ's residual functional capacity assessment with regard to Plaintiff's social limitations, this Court finds that the ALJ's social limitations were consistent with the record.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  As stated above, the ALJ's hypothetical included the social limitation of only "superficial contacts with supervisors and coworkers" and no "work  with the general public." (Tr. 67.)  Zaroff found that Plaintiff had only mild limitations in his ability to interact with the public, supervisors and co-workers.  (Tr. 387.)  The ALJ stated that Plaintiff had moderate limitations in his ability to interact socially.  (Tr. 19.)  However, in making this finding, the ALJ noted that Plaintiff "reported that he gets along well with family members and others.  He communicates and initiates social contact with others and is involved in interpersonal relationships." (*Id.*)  This is supported by evidence in the record of Plaintiff's ability to join a church, play basketball, relate well to others and maintain a relationship with a roommate, a girlfriend and his girlfriends' children.[8]  (Tr. 50-52, 314, 368, 374.)  Therefore, this Court finds that substantial evidence supports the ALJ's RFC regarding Plaintiff's social limitations.  *Pellow v. Astrue*, No. 09-11587, 2010 U.S. Dist. LEXIS 39090 (E.D. Mich. 2010).

### G. Conclusion

---

[8] During the pendency of his disability claim, Plaintiff has lived with a roommate and his new girlfriend, who has two children.  (Tr. 50-52, 314.)  Plaintiff told Therapist Maxwell that he considered his roommate, his mom and his girlfriend as his "main support."  (Tr. 314.)

For the reasons set forth below, this Court finds that the ALJ failed to fully comply with the procedural requirements of the treating source rule. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED for the ALJ to comply with the procedural requirements of the treating source rule as to Therapist Hodgson and, if necessary, modify his RFC assessment.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. A copy of any objections is to be served upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service

of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  August 30, 2011


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 30, 2011.


s/Jane Johnson
Deputy Clerk